**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

JACQUELINE MARIE KERR,

    *Plaintiff*,

v.                                      CASE NO. 10-CV-12198

COMMISSIONER OF                  DISTRICT JUDGE ARTHUR J. TARNOW
SOCIAL SECURITY,                    MAGISTRATE JUDGE CHARLES E. BINDER

    *Defendant*.
_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**[1]

**I.    RECOMMENDATION**

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

**II.    REPORT**

    **A.    Introduction and Procedural History**

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for a period of disability and disability

---

[1] The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), the recently amended provisions of Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://jnet.ao.dcn/img/assets/5710/dir7-108.pdf. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

insurance benefits (DIB), and supplemental security income benefits (SSI). This matter is currently before this Court on cross-motions for summary judgment. (Docs. 11, 14.)

Plaintiff was 47 years of age at the time of the most recent administrative hearing. (Transcript, Doc. 5 at 13, 29, 113.) Plaintiff's employment history includes work as a school bus driver for eight years. (Tr. at 140.) Plaintiff filed the instant claims on September 15, 2006, alleging that she became unable to work on December 8, 2005. (Tr. at 113, 116.) The claims were denied at the initial administrative stages. (*Id.*) On July 23, 2009, Plaintiff appeared before Administrative Law Judge ("ALJ") Ayrie Moore, who considered the application for benefits *de novo*. (Tr. at 10-25.) In a decision dated September 15, 2009, the ALJ found that Plaintiff was not disabled. (Tr. at 25.) Plaintiff requested a review of this decision on September 18, 2009. (Tr. at 8.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on March 31, 2010, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-3.) On June 3, 2010, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

**B.      Standard of Review**

In enacting the social security system, Congress created a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination which can be appealed first to the agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during the administrative

review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting S.S.R. 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). *See also Mullen*, 800 F.2d at 545. The scope of a court's review is limited to an examination of the record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 Fed. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party"); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 Fed. App'x 521, 526 (6th Cir. 2006).

**C.     Governing Law**

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). *Accord Bartyzel v. Comm'r of Soc. Sec.*, 74 Fed. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits Program (DIB) of Title II, 42 U.S.C. §§ 401 *et seq.*, and the Supplemental Security Income Program (SSI) of Title XVI, 42 U.S.C. §§ 1381 *et seq.* Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the

claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [her] impairments and the fact that [she] is precluded from performing [her] past relevant work." *Jones*, 336 F.3d at 474 (cited with approval in *Cruse,* 502 F.3d at 540). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC [residual functional capacity] and considering relevant vocational factors." *Rogers,* 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.   ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff last met the insured status requirements through September 30, 2009, and had not engaged in substantial gainful activity since December 8, 2005. (Tr. at 15.) At step two, the ALJ found that Plaintiff's degenerative disc disease, carpal tunnel syndrome, sleep apnea, and vertigo were "severe" within the meaning of the second sequential step. (*Id.*) At step

three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. at 16.) At step four, the ALJ found that Plaintiff could not perform any of her past relevant work. (Tr. at 24.) At step five, the ALJ found that Plaintiff could perform a limited range of sedentary work. (Tr. at 16-24.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 25.)

### E. Administrative Record

A review of the relevant medical evidence contained in the administrative record indicates that in December 2005, Plaintiff, who worked as a school bus driver, slipped and fell on ice when getting off the bus, injuring her head and back. (Tr. at 42, 140.) An MRI of the lumbar spine performed on January 30, 2006, revealed "[m]inimal posterior disc bulging at L4-L5 and L5-S1." (Tr. at 168.)

In February 2006, Plaintiff was evaluated at the Pain Management Center of Flint. James C. Culver, M.D., stated that Plaintiff presented with "[s]ciatica, left much worse than right[,] [c]linical evidence of S1 greater than L5 radiculitis[,] [o]nly minimal bulging of the disc was noted on MRI." (Tr. at 201.) He further noted that "[h]er MRI findings are not very impressive compared to her very impressive clinical presentation." (*Id.*) Dr. Culver then suggested epidural steroid injections. (*Id.*)

On April 25, 2006, an infrared/video ENG report was "abnormal," "consistent with peripheral vestibulopathy and possible benign positional vertigo." (Tr. at 224.) Therefore, balance therapy was recommended. (*Id.*)

Plaintiff participated in physical therapy from April 2006 to June 2006. (Tr. at 175-86.) The discharging therapist noted that "short term goal #1 [was] partially achieved and other short term

7

goals [were] fully achieved." (Tr. at 185.) Plaintiff's symptoms were decreased but she still experienced pain. (*Id.*)

Plaintiff was also evaluated by the Excel Rehabilitation Services in June 2006. (Tr. at 203-06.) At that time, it was concluded that Plaintiff "present[ed] with signs and symptoms consistent with low back pain and radicular/sciatic nerve pain [but that she] d[id] not show any signs for BPPV." (Tr. at 204.) It was also noted that she had "decreased lumbar AROM, decreased bilateral lower extremity/trunk strength, and decreased balance [such that] [p]atient may benefit from physical therapy." (*Id.*) Plaintiff's potential for rehabilitation was rated as "fair-good." (*Id.*)

An EMG performed on June 12, 2006, revealed "[l]eft S1 radiculopathy." (Tr. at 222.)

A polysomnology report completed on June 15, 2006, concluded that Plaintiff had "[o]bstructive sleep apnea[,] [s]leep disruptions[,] [p]oor sleep architecture[,] and [p]eriodic leg movements." (Tr. at 221.)

Plaintiff was treated by Gavin L. Awerbuch, M.D., from 2006 to 2008. (Tr. at 188-97, 206-14.) Dr. Awerbuch performed bilateral facet injections to relieve pain throughout this time period. (Tr. at 189, 191, 193, 197.) On September 13, 2006, Dr. Awerbuch diagnosed "[p]osttraumatic back pain with soft tissue dysfunction and left S1 radiculopathy[,] [r]ight wrist tendonitis/carpal tunnel syndrome[,] [v]ertigo and ataxia with abnormal vestibular testing[,] [and] OSA, PLMS, and excessive daytime sleepiness." (Tr. at 188.)

On June 28, 2007, Dr. Awerbuch indicated that Plaintiff was "concerned also because she has apparently been observed riding her horse and there were some questions that if she is able to engage in this type of activity that she is able to return to work . . . ." (Tr. at 210.) Dr. Awerbuch advised Plaintiff that she could continue "her horse riding activities . . . to moderation." (*Id.*) Dr. Awerbuch noted that Plaintiff had "a weight restriction of 15 pounds [and] she state[d] that the

8

saddle that [she] uses is 14 pounds and that she has been able to lift this." (*Id.*) At this same visit, Dr. Awerbuch noted that Plaintiff had "[l]umbar discopathy with radiculopathy[,] [b]ilateral carpal tunnel syndrome with tendinitis[,] [v]ertigo[,] and [o]bstructive sleep apnea with excessive daytime sleepiness." (*Id.*)

On April 18, 2006, March 15, 2007, and March 28, 2008, EMGs showed "[b]ilateral carpal tunnel syndrome." (Tr. at 215, 217, 225.)

On June 12, 2008, Dr. Awerbuch concluded that Plaintiff has "[o]bstructive sleep apnea[,] [b]ilateral carpal tunnel syndrome[,] [b]ilateral de Quervain's[,] and [l]ow back pain." (Tr. at 206.) Although Dr. Awerbuch had indicated in March 2008 that Plaintiff "appear[ed] to be developing fibromyalgia," this same notation was not present in the impression portion of his notes at any other time. (Tr. at 207.)

On August 7, 2009, Dr. Awerbuch diagnosed Plaintiff with "[c]hronic low back pain with lumbar discogenic pathology, bilateral radiculopathy, soft tissue dysfunction[,] [b]ilateral carpal tunnel syndrome[,] [b]ilateral de Quervain's disease[,] [b]ilateral knee DJD[,] [v]ertigo and ataxia[,] [o]bstructive sleep apnea[,] [d]aytime hypersomnolence, inattentiveness, poor concentration[,] and [d]epression." (Tr. at 229.)

On August 27, 2009, S. Nagarkar, M.D., diagnosed Plaintiff with major depression - single episode. (Tr. at 231.)

A medical source statement completed by Dr. Awerbuch concluded that Plaintiff has the ability to frequently and occasionally lift less than 10 pounds, stand/walk for 2 hours in an 8-hour day and could sit less than 6 hours and that she must alternate. (Tr. at 227.) Dr. Awerbuch also found moderate lower to severe upper extremity limitations in the ability to push or pull and added,

"no power tools, keyboarding[,] climbing, stooping, [or] kneeling." (*Id.*) Dr. Awerbuch concluded that the limitations would disrupt a job schedule for 40 out of the 160 hours per month. (*Id.*)

Plaintiff testified at the administrative hearing that her vertigo is unpredictable and will sometimes last for up to two weeks but that she has never been treated for vertigo. (Tr. at 39.) Plaintiff indicated that she relies heavily on her oldest son to do the grocery shopping (although she goes with him), yard work, and laundry. (Tr. at 40, 50.) Plaintiff has never undergone any surgery, nor has any been recommended. (Tr. at 42.) Plaintiff does not take any pain medication because she cannot afford them. (Tr. at 42.) Plaintiff testified that she does take anti-depressants and when asked what else she does "to help with [her] emotional problems," she responded, "[b]eer helps." (Tr. at 43.) When the ALJ followed up by asking how much she drinks, Plaintiff stated, "[t]oo much. No, no, I, anybody, not that much." (Tr. at 42.) Plaintiff clarified that she drinks "three, four beers [per day] and sometimes none." (*Id.*)

Plaintiff testified that she can lift a gallon of milk, sit for 20 minutes at a time, stand for 30 or 40 minutes, and walk for a block when not experiencing vertigo symptoms. (Tr. at 44.) Plaintiff testified that reaching sometimes makes her dizzy but that she can hold a telephone. (Tr. at 44-45.) Plaintiff explained that she has some difficulty with her hands in the morning but that she can write and can open a bottle "sometimes." (Tr. at 45.) When the ALJ questioned her ability to only open a bottle "sometimes" in light of her statement that she drinks three or four beers a day, Plaintiff clarified that she drinks "pop-a-tops." (Tr. at 45.) Plaintiff also stated that she can pick up coins, do dishes, dust, play cribbage with her eldest son, and sort clothes. (Tr. at 45, 49, 51.) Plaintiff also stated that she uses a C-PAP machine for sleep apnea and that it does help her sleep, but that she still does not sleep well. (Tr. at 46.) Plaintiff also stated that she smokes, that she is forgetful at times, and that she gets along with friends, family and her boss when she worked. (Tr. at 47.)

10

Plaintiff has not been given any physical limitations since her initial injury and she has never been told by a doctor that she should not work. (Tr. at 47-48.)

The ALJ asked the vocational expert ("VE") to assume a person of Plaintiff's background who:

> can perform at the medium exertion level of work. But because of the allegations of dizziness, she should be limited from working around hazards, which would include not working at heights or moving machinery, and she should not have a job that requires driving. And, and that, oh, and let's just for the moment assume that because of her depression, she cannot sustain concentration and persistence on complex tasks. But she can do simple work, simple unskilled work tasks that can be learned within 30 days.

(Tr. at 56.) The VE indicated she could not perform Plaintiff's past relevant work because of the inability to drive. (*Id.*) The ALJ then asked the VE if there would be other medium level jobs she could do and the VE indicated there are 10,000 hand packager, 15,000 institutional cleaner, and 6,000 laundry cleaner jobs that could be performed. (Tr. at 56-57.)

The ALJ then added that such person "can frequently, but not constantly, use her arms, her hands for gripping." (Tr. at 57.) The VE indicated that the hand packager job would be excluded but that the cleaner and laundry laborer jobs could still be performed. (*Id.*) The VE indicated a third possible job would be pot washer, of which there are 3,000 in the relevant economy. (*Id.*)

The ALJ then added the limitation that such person could not use her arms for overhead work and the VE responded that the medium exertion level jobs would be precluded, except possibly the laundry laborer jobs. (Tr. at 57-58.) The ALJ then asked what result if the limitation were changed to occasional overhead work, and the VE responded that "there would be absolutely no problem with the cleaners . . . [and that] dishwasher would also be feasible." (Tr. at 58.)

The ALJ then asked the VE to consider a "third hypothetical . . . assum[ing] light work with the same limitations as in hypothetical one and go to no overhead work, to which the VE

11

responded, "we would have some inspector packagers, and those are considered routine because the inspections are a visual during packaging [] there would be at least 7,000 such jobs at the light range" in addition to 4,000 laundry folder jobs, and 3,000 cafeteria attendant jobs. (Tr. at 59.)

The ALJ then asked the VE to assume the same limitations under the sedentary level and the VE indicated there would be 4,000 contact assembler jobs, 2,000 visual inspector jobs, and 3,000 simple cashiers (unskilled) found in theater ticket booths, parking lots, and such. (Tr. at 60.) The ALJ also asked whether employment would be possible if a person needed to lie down all day on and off and the VE indicated that employment would be completely ruled out. (Tr. at 61.)

The VE testified that her testimony was consistent with the Dictionary of Occupational Titles (DOT). (Tr. at 53-55, 57, 60.)

When Plaintiff's counsel inquired how a concentration impairment that would render a person "completely off task" for 20 percent of the workday would affect employability and the VE responded that it would preclude competitive employment. (Tr. at 61.)

The ALJ then asked if an additional restriction to "unskilled work, tasks that could be learned within 30 days . . . if this also were restricted to routine repetitive work tasks, would that have impacted your answer?" (Tr. at 62.) The VE indicated that such an additional limitation would preclude the cashier jobs. (Tr. at 62-63.)

    **F.**    **Analysis and Conclusions**

    **1.**    **Legal Standards**

The ALJ determined that during the time she qualified for benefits, Plaintiff possessed the residual functional capacity to perform a limited range of sedentary work. (Tr. at 16-24.) Sedentary work involves lifting no more than ten pounds at a time and occasionally lifting and carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one that

involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a)(1991). Social Security Ruling 83-10 clarifies this definition:

> "Occasionally" means occurring from very little up to one-third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday. Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles.

SSR 83-10.

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2. Substantial Evidence

Plaintiff contends that substantial evidence fails to support the findings of the Commissioner. (Doc. 11.) As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan,* 474 F.3d at 833; *Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Plaintiff specifically contends that the Commissioner erred by forming a hypothetical that did not accurately portray Plaintiff's impairments. (Doc. 11 at 6-11.) Plaintiff contends that the hypothetical should have incorporated her knee impairments, mental impairment related to her physical impairments and pain, and her sleepiness. (Doc. 11 at 7.) In addition, Plaintiff notes that although the ALJ's decision indicated that the sedentary hypothetical contained a limitation to

13

match the RFC assessment regarding "frequent but not constant handling and fingering," there is nothing in the relevant fourth hypothetical given in the hearing transcript regarding such a limitation. (Doc. 11 at 8; Tr. at 16, 60.)[2]

The ALJ indicated that Plaintiff's limitations due to pain and numbness in her arms and hands were accommodated by "restricting her to the minimal lifting requirements of sedentary work that does not require constant handling or fingering or any overhead lifting." (Tr. at 20.) In addition, the ALJ stated that Plaintiff's back pain was accommodated "by restricting her to the minimal demands of sedentary work." (*Id.*) In addition, the ALJ "accommodated her vertigo by restricting her to the minimal demands of sedentary work with no overhead work or no work that involves hazards or moving machinery." (Tr. at 21.) The ALJ indicated that considering Plaintiff's background and limitations in the unskilled sedentary job market, she could "perform the requirements of representative occupations such as: (1) assembler, with 4,000 jobs in Michigan; (2) visual inspector, with 2,000 jobs in Michigan; and (3) simple cashier, with 3,000 jobs in Michigan." (Tr. at 25.)

Plaintiff correctly notes that the ALJ's references to available jobs are based on the "fourth" hypothetical. However, Plaintiff's contention that the ALJ failed to include any fingering limitations in the fourth hypothetical is not supported by the record. The ALJ's fourth hypothetical was, like the previous two, a cumulative hypothetical where the ALJ continued to add on restrictions. Therefore, the fourth hypothetical included all the previous limitations:

> . . . because of the allegations of dizziness, she should be limited from working around hazards, which would include not working at heights or moving machinery, and she should not have a job that requires driving. . . . [B]ecause of her depression,

---

[2]Plaintiff further notes that the jobs listed in the decision of the ALJ are the same as those listed after the fourth hypothetical to show that the fourth hypothetical is the one described by the ALJ. *Id.*

> she cannot sustain concentration and persistence on complex tasks. But she can do simple work, simple unskilled work tasks that can be learned within 30 days.
> . . .
> [She] can frequently, but not constantly, use her arms, her hands for gripping . . . .
> . . .
> [For the second hypothetical,] I want you to give me some jobs with these limitations that could be done without doing overhead work . . . .
> . . .
> [For the third hypothetical,] assume light work with the same limitations as in hypothetical one and go to no overhead work . . . .
> . . .
> [For the fourth hypothetical,] the same for sedentary work . . . .

(Tr. at 56-60.) Therefore, the ALJ did include a limitation for fingering in the fourth and final hypothetical relied on in the ALJ's decision. (Tr. at 21-25, 56-60.) Although Plaintiff argues that the ALJ also failed to incorporate restrictions based on her knee, mental, and sleepiness impairments (Doc. 11 at 7), I suggest the above references to the transcript reveal that all Plaintiff's limitations were considered in formulating the hypothetical.

I further suggest that the ALJ's findings follow the opinions of the vocational expert, which came in response to detailed and proper hypothetical questions that accurately portrayed Plaintiff's individual impairments in harmony with the relevant objective record medical evidence and with Plaintiff's own statements that she can lift a gallon of milk, sit for 20 minutes at a time, stand for 30 or 40 minutes, walk for a block when not experiencing vertigo symptoms, hold a telephone, write, open "pop-a-tops," pick up coins, do dishes, dust, play cribbage with her son, sort clothes, and ride a horse. (Tr. at 44-45, 49, 51, 210.)

### 3. Conclusion

For all these reasons, after review of the record, I conclude that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

**III.    REVIEW**

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).  The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan*, 474 F.3d at 837; *Frontier Ins. Co.,* 454 F.3d at 596-97.  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.

                                          s/ **Charles E Binder**
                                          CHARLES E. BINDER
Dated: March 22, 2011                          United States Magistrate Judge

**CERTIFICATION**

I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date:  March 22, 2011                          By     s/Patricia T. Morris
                                                                Law Clerk to Magistrate Judge Binder